# In the United States Court of Federal Claims

No. 26-906
(Originally filed: November 6, 2026)
(Reissued: November 19, 2026)[1]

* * * * * * * * * * * * * * * * * * * * * * * * *

INSIGHT PUBLIC SECTOR, INC.,

*Plaintiff*,

v.

THE UNITED STATES,

*Defendant.*

* * * * * * * * * * * * * * * * * * * * * * * * *

*J. Andrew Howard*, Los Angeles, CA, with whom was *Jeffrey Belkin*, Atlanta, GA, for plaintiff, Insight Public Sector, Inc.

*Nathanael B. Yale*, Senior Trial Counsel, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., with whom were *Brett A. Shumate*, Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Corinne A. Niosi*, for defendant. *Jennifer L. Howard*, Senior Attorney, and *Stephen T. O'Neal*, Senior Attorney, Office of the General Counsel, National Aeronautics and Space Administration, of counsel.

## OPINION

BRUGGINK, *Senior Judge.*

Pending in this post-award bid protest are Insight Public Sector, Inc.'s ("Insight") motion for judgment on the administrative record and the United States' ("the government") cross-motion for judgment on the administrative record. This matter is fully briefed, and we heard oral argument on October

---

[1] This opinion was originally issued under seal to afford the parties an opportunity to propose any redactions of protected information. The parties have conferred and reached an agreement on proposed redactions, which we have adopted. Redactions are indicated by the insertion of brackets in place of original material.

21, 2026. At argument, we indicated our intent to reject Insight's request for injunctive relief. This motion sets forth our reasoning and final ruling.

## BACKGROUND

### I. Relevant Facts

#### A. The Solicitation and Invitation for Bids

On May 23, 2024, the government, acting through the National Aeronautics and Space Administration ("NASA" or the "agency"), issued Request for Proposal ("RFP"), Solicitation No. 80TECH24R0001, for "6th Generation of Solutions for Enterprise-Wide Procurements Government-Wide Acquisition Contracts" ("SEWP VI"). Administrative Record ("AR") Tab 1a, 3. The principal purpose of SEWP VI was to provide the government with an "all-encompassing one-stop acquisition vehicle" for information technology ("IT") products and services. *Id.* NASA sought to make awards under an indefinite delivery, indefinite quantity ("IDIQ") contract to "all qualifying offerors." *Id.*; Tab 15a, 1703. All awardees would then compete for fixed price, time-and-materials, labor hour, fixed-price award fee, fixed-price incentive fee, and fixed-price economic price adjustment task orders. AR Tab 1a, 3. The RFP called for a contract duration of ten years, with a maximum ordering value of $20 billion. AR Tab 15a, 1626, 1630.

The agency issued the RFP in accordance with Federal Acquisition Regulation ("FAR") part 15. Consistent with FAR 15.304(c)(1)(ii)(A)(3), NASA planned to award to every qualifying offeror in three self-contained categories, without discussions, not evaluating price. *Id.* at 1703. To qualify for an award, an offeror had to: (1) submit a proposal conforming to the category requirements under which it was proposed, (2) pass the three-phase firm-down selection process, (3) be a responsible source pursuant to FAR 9.104, and (4) be otherwise eligible for award. *Id.*

Offerors were permitted to submit proposals in multiple categories, so long as each submission was a complete and separate proposal. *Id.* at 1681. Each category contemplated its own scope of work, fulfillment and submission requirements, and evaluation criteria. Category A contractors would provide IT, communications, and audio-visual ("ITC/AV") equipment. Contractors in Category B would provide enterprise-wide ITC/AV service solutions, and, within Category C, contractors would provide ITC/AV mission-based support. *Id.* at 1611–25. This protest involves only Category B submissions.

To be eligible for an award, NASA required that each proposal meet the requirements of the three-phase firm-down-selection process. *Id.* at 1703. At Phase One, the Source Evaluation Board ("SEB") planned to evaluate certifications, mandatory experience/offerings, and North American Industry Classification System ("NAICS") code verification. *Id.* at 1704. At Phase Two, the government planned to evaluate offerors on their past performance. *Id.* at 1705. Finally, at Phase Three, the agency intended to evaluate offerors' mission suitability, namely their management and technical approaches. *Id.* at 1708. At the completion of each phase, NASA intended to make a firm-down selection by eliminating all non-qualifying offerors. It would then notify those offerors that they were no longer award-eligible and provide a brief explanation. Once an entire evaluation phase was completed, NASA would notify all remaining offerors that they were advancing to the next stage.

Relevant to this protest, RFP Section A.3.7.1(c) required Category B offerors to submit Relevant Experience Projects ("REP" or "REPs") as part of Phase One. *Id.* at 1691. The solicitation defined a REP "as a single contract or task order" where the offeror was "either a prime or subcontractor." *Id.* Each REP was to address a different technical area and was to be from a "separate and distinct contract, task order, or project." *Id.* The CO planned to evaluate REPs on a pass/fail basis. *Id.* at 1704.

Category B offerors categorized as "Other than Small Businesses," such as plaintiff, were required to submit four different REPs. *Id.* at 1691. Offerors bidding as small businesses were only required to submit three distinct REPs. *Id.* at 1692. All other offerors bidding as HUBZone, SDB, VOSB, SDVOSB, WOSB, EDWOSB, or 8(a), were required to submit only two distinct REPs. *Id.* All offerors were instructed to submit their REPs using the following table.

**Relevant Experience Project Cover Page**
This attachment is in support of solicitation 80TECH24R0001
Refer to Section A.3.7.1(c) of the solicitation for further information.

**PART I: PROJECT IDENTIFICATION**

| | |
|---|---|
| CONTRACTOR NAME: | |
| CONTRACT NUMBER: | |
| ORDER NUMBER (if applicable): | |
| PROJECT TITLE:(limit to 50 characters) | |
| CUSTOMER: | |
| TOTAL PERIOD OF PERFORMANCE, INCLUDING OPTIONS: (MM/YYYY - MM/YYYY or MM/YYYY – Present) | |
| PROJECT VALUE: | |
| NAICS CODE (Enter N/A if not applicable): | |
| **Mandatory Experience Technical Area** | |
| | |

**PART II: PROJECT REFERENCE INFORMATION**
**Contracting Officer (or Corporate Official for Commercial or Subcontractor Experience)**

| | |
|---|---|
| NAME: | |
| TITLE: | |
| AGENCY or CUSTOMER: | |
| PHONE: | |
| E-MAIL: | |

**PART III: PROJECT DESCRIPTION**
Provide a clear and concise description of the IT service as it relates to the Mandatory Experience Technical Area. Use a font, no smaller than 10 point. ***The completed REP description may not exceed a total of three (3) pages*** and should be attached to this Exhibit cover page. Any text exceeding three pages will not be considered.

AR Tab 15b, 1741.

The RFP required each REP to have a minimum of $30M in total contract value and cover one of the technical areas listed in the solicitation. AR Tab 15a, 1691. Offerors were allowed to submit REPs from previous NASA contracts, other federal government contracts, state contracts, and/or commercial contracts. *Id.* NASA required that each REP be recent—either "completed or ongoing within three years of the original SEWP VI solicitation release date." *Id.* The solicitation was clear that if the REP requirements were not met, a proposal would be classified as failed, and the offeror would no longer be eligible for award. *Id.* at 1704.

B. The Award Process

NASA received a total of 2,365 proposals—459 Category A proposals, 747 Category B proposals, and 1,159 Category C proposals.

i. REP Evaluations

Insight timely submitted its Category B proposal on February 19, 2025.[2] Insight included four REPs to fulfill the requirements of Section A.3.7.1(c). NASA determined that the first three REPs complied with the

[2] Insight also submitted a Category A proposal and was awarded a contract.

RFP's requirements. AR Tab 45, 3086. The fourth REP—a contract with Texas Health and Human Services ("Texas REP")—failed, however, to state a contract value. The REP also failed to include a contract number or an order number. The portion of Insight's proposal relevant to that REP is included below.

**Relevant Experience Project Cover Page**
This attachment is in support of solicitation 80TECH24R0001
Refer to Section A.3.7.1(b) of the solicitation for further information.

**PART I: PROJECT IDENTIFICATION**

| | |
|---|---|
| CONTRACTOR NAME: | Insight Public Sector, Inc. |
| CONTRACT NUMBER: | N/A - State & Local contract |
| ORDER NUMBER (if applicable): | N/A |
| PROJECT TITLE: | HHSC Network Operations and Support Services |
| CUSTOMER: | Texas Health and Human Services |
| TOTAL PERIOD OF PERFORMANCE, INCLUDING OPTIONS: (MM/YYYY - MM/YYYY or MM/YYYY – Present) | 06/2021 - present |
| PROJECT VALUE: | N/A - State & Local Contract |
| NAICS CODE (Enter N/A if not applicable): | N/A - State & Local contract, but most closely aligned with NAICS 541519 |
| **Mandatory Experience Technical Area** | Technical Area 1b: Enterprise-Wide Network Services. |
| | |

AR Tab 25i, 2789.

NASA was unable to establish, based solely on the information submitted, that the Texas REP met the $30M requirement. AR Tab 60, 4285 (Contracting Officer's Statement of Facts). The contracting officer ("CO") confirmed that the information could not be found elsewhere in Insight's proposal by consulting the REP's narrative portion and the Past Performance volume. *Id.* Insight did not provide a contract number, and because it was a state contract, NASA could not search publicly available federal databases to attempt to determine a project or contract value. *Id.* at 4286. Because of the information missing from the fourth REP, NASA deemed its proposal unacceptable and eliminated it from the competition on February 17, 2026. AR Tab 1 at 1.

Like Insight, other offerors were eliminated for failing to comply with the solicitation's REP requirements. *See* AR Tab 45, 3082–89. [ ], [ ], and [ ] did not submit REPs for separate and distinct contracts. [ ] and [ ] submitted less than the required number of REPs, and [ ] failed to include any REPs at all. Based on these errors, NASA deemed all six of their proposals as "failed" at Phase One and eliminated each offeror from the competition.

NASA was, however, able to verify other offerors' missing

information by consulting the FPDS-NG[3], a federal database it believed to be too close at hand to ignore. *See* AR Tabs 31–36, 45 at 3088. [ ] submitted two REPs with its proposal[4], but the value of one appeared to be below the solicitation's minimum. The CO consulted the FPDS-NG which allowed it to confirm that the actual project value was above the minimum requirement. Because both of [ ] REPs met the RFP requirements, NASA kept it in the competition. *Id.* Similarly, both [ ] and [ ] submitted REPs which appeared to be below the minimum project value. Again, the CO initiated a search of the FPDS-NG that allowed it to verify that both contracts met the minimum required by the RFP. [ ] submitted a REP which did not appear to meet the RFP's recency requirements. The CO verified by consulting the FPDS-NG that the actual contract dates met the RFP's recency requirements. Finally, [ ] submitted four REPs, but one of the federal contracts it proposed failed to state a project value. It included a contract number and accurate performance period, however, making it possible for the CO to confirm that the project value was [ ], above the required $30M threshold.

ii. Communications with Offerors

During its evaluation of other RFP requirements, NASA conducted over 200 clarifying exchanges with other offerors regarding three discrete proposal components. One such component was signature validation. *See, e.g.*, AR Tab 69, 5001. RFP Section A.3.7.1(a) instructed offerors to sign and complete the SF 1449, certifying that the offeror "read, understands, and agrees to the terms and conditions of the RFP . . . ." Tab 15a, 1686. NASA emailed at least thirty-eight offerors to "confirm that the information in block 30a (SIGNATURE OF OFFEROR/CONTRACTOR) of the SF 1449" was a valid signature and an "intent to respond to the subject solicitation." *See* AR Tab 69, 5001–55, 5778–852. In every email, NASA instructed offerors "not" to provide "additional information or submission material." *Id.* Offerors were only permitted to confirm the validity of the signature.

NASA also solicited additional financial capability documentation from at least sixty-two offerors. *See, e.g.*, Tab 69, 5056 (notifying an offeror

---

[3] FPDS-NG stands for Federal Procurement Data System – Next Generation. Since this procurement, the public-facing functionality of the FPDS-NG has transitioned to https://sam.gov/contracting.

[4] [ ] was competing for a HUBZone contract. AR Tab 30. The solicitation required such offerors to submit only two REPs.

that its proposal did not include sufficient documentation of its ability to perform the SEWP VI contract). RFP Section A.3.7.1(a) required offerors to submit information demonstrating their "financial capability to perform the contract" for the responsibility determination of FAR 9.104-1(a). AR Tab 15a, 1688. Beginning September 2, 2025, NASA permitted deficient offerors to submit bank letters detailing the contractors' available amount of credit or the company's annual report. *See* AR Tab 69, 5056. Offerors who responded with sufficient capability information by the deadline remained in the competition.

Finally, NASA asked fifty-five offerors to resubmit tax-matters certifications. RFP Section A.5.5, incorporating FAR 52.209-12, required offerors to certify they had filed the previous three years of federal tax returns, they had not been convicted of a tax-related crime, and that they had not been notified of unpaid taxes or the assessment of a judicial proceeding against them. AR Tab 15a, 1734. NASA again directed offerors not to provide any "additional information or submission material." *See* AR Tab 69, 5355. Instead, the CO directed offers to respond only to the FAR certification as it appeared in the RFP. *Id.* Again, responsive offerors remained in the competition.

None of these clarifications involved deficiencies in the REP submissions.

The CO issued his Source Selection Statement on June 18, 2026. AR Tab 52, 3990. All offerors that passed each evaluation phase received a contract in their respective category: 364 awardees in Category A, 692 awardees in Category B, and 1,059 awardees in Category C. *Id.* at 3989. Insight was not among the Category B awardees.

## II. Procedural History

On February 27, 2026, Insight filed a protest at the Government Accountability Office ("GAO") challenging its elimination from the SEWP VI competition. AR Tab 55, 4046. Insight alleged that the agency unlawfully deemed it ineligible for award, because it was clear that the defect with respect to its fourth REP, "N/A – State & Local Contract," was a clerical error. *Id.* at 4053. Insight argued that the agency erred in rejecting its proposal "simply because the box on the form did not explicitly list a value that was $30 million or higher" because NASA should have communicated with Insight to clarify the missing contract information. It characterized this as an abuse of the agency's discretion. In response, NASA submitted the CO's Statement of Facts in which the CO explained that during evaluations he

believed that communicating with Insight to obtain the missing project value would have constituted improper discussions; that they would have involved more than mere clarifications. *See* AR Tab 60, 4285–86 ¶ 23. Absent the requisite fourth REP, the agency concluded that Insight failed to meet the "clear requirements of the RFP." AR Tab 59, 4270. GAO agreed and denied Insight's protest. *Insight Public Sector, Inc.*, B-423306.17.

Insight filed its complaint here on June 23, 2026. Plaintiff alleges that the agency's evaluation of Insight's proposal was arbitrary, capricious, an abuse of discretion, and contrary to law, and seeks a permanent injunction requiring NASA to reinstate it into the competition.

On August 18, 2026, Insight filed its motion for judgment on the administrative record, and on September 4, 2026, the government filed its cross-motion and response. The motions are fully briefed, and we heard oral argument on October 21, 2026. After oral argument, plaintiff filed a motion for leave to file a motion to clarify the record.[5] *See* ECF No. 35.

The motions before us expose three potential ways the agency might have obtained information omitted from offerors' proposals: clarifications, discussions, and consultation of information "too close at hand to ignore." Plaintiff's position is that NASA erred by taking none of these actions. According to Insight, its "minor error"—inserting "N/A State & Local Contract" in the place of a project value—could have readily been resolved by a quick clarifying exchange or by consultation of a public website for Texas state contracts. Instead, the CO determined that, unlike the deficiencies identified in other bidders' proposals that could be resolved through clarification, Insight's deficiency was so significant that a conversation to eliminate the problem would have amounted to an improper discussion, allowing plaintiff, in effect, to alter its proposal, and that the missing contract information was not "too close at hand to ignore" because it was not readily available in a federal database.

---

[5] Plaintiff's motion is denied. Though styled as a motion to clarify, it addresses arguments already contemplated by plaintiff's original motion for judgment on the administrative record. Insight seeks to clarify a factual issue that it believes was "crystallized" during oral argument. Namely, it wishes to highlight the CO's contemporaneous conclusion that, as a matter of law, the agency could not obtain the missing value of the Texas REP, as doing so would constitute an impermissible discussion. Plaintiff seeks a remand to the agency to correct what it views as a legal error.

Plaintiff argues that NASA committed "legal error" by concluding that obtaining the missing contract value would have constituted an impermissible discussion because, in its view, inserting the missing value would not have materially altered Insight's proposal. It contends that any communication would have fallen squarely within the scope of a permissible clarification, and it points to the litany of clarifying exchanges between NASA and other offerors as evidence that a similar exchange to correct its REP could have occurred.

Insight also argues in the alternative that any communication to confirm the contract value would have been unnecessary, because the missing information readily could have been obtained from accessible databases containing Texas state contract information, comparable to the federal databases used to confirm other bidders' REP data. Insight contends that the agency was required to treat its bid "consistently" by consulting a state contracting database after the agency searched the FPDS-NG for other offerors REP information. In sum, Insight believes that: "[t]he Agency either applied an erroneous legal rule to Insight, or it selectively withheld from Insight the same opportunity it gave other offerors to resolve mandatory eligibility issues." Pl.'s Mot. J. Admin. R. at 21. Either way, Insight contends its elimination from the competition was in error. *Id.* We disagree.

## DISCUSSION

We review motions for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims. Rule 52.1 directs us to conduct "the equivalent of an expedited trial on a 'paper record.'" *Elec. On-Ramp v. United States*, 104 Fed. Cl. 151, 158 (2012) (quoting *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)). To review cross-motions, we ask whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the record evidence. *See Bannum*, 404 F.3d at 1356–57.

In bid protests, we review an agency's decisions pursuant to the standards in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4). Under the APA, we will not disturb an agency's decision unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Thus, we will not "set aside" an agency's procurement decision unless either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a regulatory or procedural violation. *Glenn Def. Marine Asia, PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013) (quoting *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010)).

"Contracting officers are given broad discretion in their evaluation of bids." *Dyncorp Int'l, LLC v. United States*, 10 F.4th 1300, 1311 (Fed. Cir. 2021). Our role is "not to determine what [the agency] could have done in its evaluation; rather, it is to determine whether [it] had a rational basis for what it did. *Crowley Gov't Servs., Inc. v. United States*, 158 Fed. Cl. 358, 375 (2022). And when the agency has a rational basis for a decision in the scope of its discretion, we will not "substitute [our] judgment for that of the agency." *Dyncorp*, 10 F.4th at 1311.

I. Insight's error was not of the type that NASA could have resolved through a clarification.

The FAR categorizes agency communications with offerors during evaluations as either discussions or clarifications. *See* 48 C.F.R. § 15.306. Clarifications are "limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated." *Id.* at (a)(1). In contrast, discussions are "negotiations" with each offeror typically "in a competitive acquisition . . . after the establishment of the competitive range." *Id.* at (d). As relevant here, only discussions can be used to attempt to cure a material error or omission in an offeror's proposal. *See Kropp Holdings, Inc. v. United States*, 176 Fed. Cl. 512, 540 (2025).

Based on the agency's explanation at GAO, the CO determined that that a conversation to obtain the missing project value would have been an impermissible discussion: "NASA would have to enter into discussions to request an update to Insight's proposal to determine whether the project met the threshold requirements of the RFP for Category B." AR Tab 60, 4286 (CO's Statement of Facts). Plaintiff argues that this determination was legal error, because the omission was a minor "clerical error" that NASA should have contacted Insight to correct. Pl.'s Mot. J. Admin. R. 18. Insight contends that its "reliance on that singular contract carried the implied certification that the Texas REP met the minimum contract value threshold." *Id.* at 14. Therefore, any communication by NASA would merely "confirm" Insight's intent to submit a compliant contract, rather than effect a material proposal change. Insight further argues that the CO took an inconsistent approach by eliminating it without clarification while choosing to clarify errors with other offerors. *Id.* at 21.

The government responds that such a communication improperly would have allowed Insight to alter its proposal to meet a material requirement of the RFP. D.'s Mot. J. Admin. R. 24. We agree with the government.

Prior to the 1997 FAR revisions, clarifications were limited to communications "for the sole purpose of eliminating minor irregularities, informalities, or apparent clerical mistakes in the proposal." 48 C.F.R. § 15.601 (1991). Under this old regulation, all other exchanges for a larger purpose, specifically communications "(a) involving information essential for determining the acceptability of a proposal, or (b) providing the offeror an opportunity to revise or modify its proposal," would constitute discussions. *Id.* The revised regulation defines clarifications more broadly as "limited exchanges," in which "offerors *may be* given the opportunity to clarify certain aspects of proposals . . . or to resolve minor clerical errors." 48 C.F.R. § 15.306(a) (emphasis added). Though the current definition of clarifications has broadened to allow agencies to resolve "certain aspects of proposals," *id.* at (a)(2), it has not been expanded to include exchanges which "cure proposal deficiencies or material omissions . . . or otherwise revise the proposal." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 998 (Fed. Cir. 2018).

"Material changes to proposals can only be accomplished through discussions and not through clarifications." *ManTech Advanced Sys. Int'l v. United States*, 141 Fed. Cl. 493, 509 (2019). An error is material if it "violates an express provision of the RFP," and that element of the proposal "serves a substantive purpose in the evaluation process." *ManTech*, 141 Fed. Cl. at 508. Accordingly, an exchange that allows a contractor to revise an element of its proposal that was a condition precedent to the agency's ability to accept it is not within the scope of a permissible clarification. *See, e.g.*, *Mission Essential, LLC*, Comp. Gen. Dec. B-418767, 2020 CPD ¶ 281; *DigiFlight, Inc. v. United States*, 150 Fed. Cl. 650, 659 (2020) (offeror could not cure its failure to include mandatory information); *SOC LLC*, Comp. Gen. Dec. B-415460.2, 2018 CPD ¶ 20 (offeror could not cure unacceptable licensing and key personnel deficiencies); *DataSource, Inc.*, Comp. Gen. Dec. B-412468, 2016 CPD ¶ 59 (agency could not insert the offeror's missing letter of intent).

In this case, plaintiff's omission was material. Insight was on notice that a failure to include four compliant REPs in its proposal would result in its elimination from the competition. We are unpersuaded that Insight's submission of the REP carried any "implied certification" that it met the solicitation's minimum requirements. Any exchange would have allowed Insight to correct a substantial omission and thereby materially alter its otherwise failed proposal in order to remain in the competition.

We are similarly unpersuaded that NASA treated plaintiff differently than the 200 other offerors with whom it did conduct clarifying exchanges. With respect to Insight's omission, the agency obviously viewed an exchange

to obtain the missing contract value as different in kind, and we believe that the decision to characterize it as such was within the agency's discretion. The REP data the agency would have sought from Insight went to the heart of Insight's proposed ability to perform the contract. This information, in effect, was the only means the agency had to ensure that bidders could fulfil the contract. The information needed to correct Insight's proposal was dissimilar from the type of information the government sought in its over 200 clarifying exchanges.

The communications Insight points to—characterized by the government as clarifications—fall into three categories: signature confirmations, financial responsibility supplementations, and tax-matters certifications. *See* AR Tab 69, 5001–61, 5306–723, 5734–861. In seeking signature confirmations and tax-matters certifications, for example, the government did not allow offerors to supplement their offers with any new information. While new information did come in through the government's request for additional financial capability documentation, this inquiry occurred as part of the mandatory responsibility determination, outside the firm-down selection process. Importantly, communications regarding contractor responsibility are permissible clarifications. *See Seabee Constr., Inc. v. United States*, 182 Fed. Cl. 75, 88 (2026) ("[C]ommunications aimed at responsibility do not constitute discussions."). There is no indication that any successful offerors failed wholly to include required information and supplied it through clarifications. We view those other communications, as NASA did, to be different in kind. The CO was not compelled by law to inquire of Insight for the missing information and his determination that such an exchange would have constituted an improper discussion was not an error of law.

II. The agency did not abuse its discretion in not searching elsewhere for information about the Texas HHS contract.

According to Insight, its proposal was rejected for a deficiency "identical" to five other proposal defects regarding REPs that NASA readily verified through a search of "public information." Pl.'s Mot. J. Admin. R. 19. Insight points to five other offerors who were allowed to continue in the competition despite submitting similarly deficient REPs. Three Category B offerors—[ ], [ ], and [ ]—listed contract values below the RFP's minimum value threshold. [ ] listed a performance period that did not comply with the RFP's recency requirements. A fifth offeror, [ ], completely omitted a project value, but included a contract name, number, and date range. NASA was able to correct the errors and omissions by searching the FPDS-NG. Plaintiff believes that under the "too close at hand"

doctrine, NASA should have also consulted the Texas Health and Human Services contracting database to obtain the missing contract value. Insight argues that failing to do so constituted disparate treatment. *See id.* at 18. Plaintiff's argument hinges on its belief that both databases are "public information," that could not be ignored by NASA. *See id.* at 19. We disagree.

FAR 15.305(a)(2)(ii) requires the government to consider both the information submitted by offerors and "information obtained from any other sources" in its evaluation of past performance information. 48 C.F.R. § 15.305(a)(2)(ii). Following this provision, GAO has recognized that in limited circumstances, an evaluating agency has an obligation to consider outside information bearing on an offeror's proposal. *See Int'l Bus. Sys., Inc.*, Comp. Gen. Dec. B-275554, 1997 CPD ¶ 114. Similarly, the court has found that some "information is simply too close at hand to require offerors to shoulder the inequities that spring from an agency's failure to obtain and consider the information." *Vanguard Recovery Assistance v. United States*, 101 Fed. Cl. 765, 781 (2011) (quoting *Int'l Bus. Sys., Inc.*, Comp. Gen. Dec. B-275554, 1997 CPD ¶ 114). The universe of close at hand information tends to fall into two categories: (1) documents in the agency's possession or (2) the personal knowledge of the evaluators. *See e.g.*, *Vanguard*, 101 Fed. Cl. at 781; *MG Altus Apache Co. v. United States*, 102 Fed. Cl. 744, 751 (2012) (finding that a contractor's letter in the agency's possession was "too close at hand" to ignore); *Chenega Healthcare Servs., LLC v. United States*, 138 Fed. Cl. 644, 651 (2018) (stating the doctrine may sometimes "oblige[] an agency to consider information that was not included in a proposal but which is known to the agency's evaluators"); *ProSecure, LLC v. United States*, 151 Fed. Cl. 697, 707 (2020) (stating that the doctrine may require agencies to consider information if the agency "possesses personal knowledge or internal information pertaining to an offeror's contract or prior work"). The "too close at hand" doctrine has been described as a way to reign in an agency's discretion to avoid "inequitable selections of the information used to evaluate the bids." *Insight Pub. Sector, Inc. v. United States*, 157 Fed. Cl. 398, 411 (2021).

Contrary to Insight's argument, NASA was not required to consult the Texas Health and Human Services contracting database to discern the value of the contract. NASA consulted its federal contract database because it was immediately within the agency's possession and access. Although the solicitation allowed contractors to submit any combination of state, commercial, or federal contracts, the FAR requires the government to maintain sam.gov (formerly the FPDS-NG) to "increase visibility of vendor sources" and "establish a common source of vendor data for the

Government." 48 C.F.R. § 4.1100. The FAR also requires that the government submit frequent contractor performance evaluations to the Contractor Performance Assessment Reporting System ("CPARS") and use such information in its procurement decisions. 48 C.F.R. § 42.1503(g). The FAR thus requires agencies to maintain and consult the federal contracting database. The same is not true of state contracts.

Having chosen to consult a federal database that was immediately accessible, NASA was, indeed, obligated to treat plaintiff the same way, but we think there is a distinction between a federal database to which the agency was directly connected and a state level database which was merely "public information." The agency was able to track down Insight's numerous contracts with the State of Texas only after it was referred, by Insight, to the website and given other information concerning the date of the contract. But that occurred only after the GAO protest was filed. We decline to extend the concept of "too close at hand" to include anything accessible on the internet.[6]

We note, moreover, that Insight's omitted information was distinguishable from the omissions made by four of the other offerors. [ ], [ ], [ ], and [ ] each submitted contract values and performance dates in the REP forms. Even though [ ] omitted a project value, it still submitted enough information to allow the government to identify it in the federal contracting database. Unlike these five offerors, Insight responded, "N/A – State & Local Contract," to the contract number and project value fields. *See* AR Tab 25i, 2789. It also identified the period of performance as June 2021, which does not match the contract's actual start date of September 1, 2021. *Id.*; D.'s Mot. J. Admin. R. 22–23. Due to the additional missing information, NASA could not just "insert" the information from the Texas REP into a contracting database. Instead, it had to search for the database, evaluate Insight's contracts, and compare the work descriptions to confirm the value of the Texas REP.

---

[6] In *Kace Co., LLC v. United States*, this court rejected a similar argument that the "too close at hand" doctrine was triggered because the government "could have obtained the necessary [] information through internal sources, contacting the contracting agencies listed in the cited corporate experience examples, or by simply asking [the plaintiff]." *Kace Co., LLC v. United States*, 167 Fed. Cl. 192, 208 (2023). There, as here, we determined that the "universe of information" considered to be "too close at hand" was limited, and the government was not required to find "alternative ways" to discern the information omitted by the plaintiff. *Id.*

Nor can Insight claim it was the only offeror eliminated for an error in its REP. Like Insight, several offerors were eliminated for failing to comply with the solicitation's REP requirements. *See* AR Tab 45 at 3082–89. Though Section A.3.7.1(c) required offerors to submit four REPs from "separate and distinct" contracts or task orders, [ ] proposed three REPs from the same contract. AR Tab 45, 3082. Similarly, [ ] submitted four REPs from the same contract, *id.* at 3083, and [ ] failed to include any REPS at all. *Id.* at 3084. [ ], a small business, included only one REP. *Id.* at 3085. [ ], another small business, submitted two REPs from the same contract, *id.* at 3087, and [ ] submitted only one. *Id.* at 3089. Based on these errors, NASA deemed proposals from [ ], [ ], [ ], [ ], [ ], and [ ] as failed at Phase One and eliminated each offeror from the competition.

CONCLUSION

Insight has not shown that the agency acted arbitrarily, capriciously, or in violation of the law. Having concluded that plaintiff fails on the merits, we find that it is not entitled to injunctive relief. We therefore grant the government's motion for judgment on the administrative record and deny plaintiff's motion for judgment on the administrative record. The matter is dismissed. We also deny plaintiff's motion for leave to file a motion to clarify the record. Judgment accordingly.

s/Eric G. Bruggink

ERIC G. BRUGGINK
Senior Judge